Hillsborough,
No. 4781.

ALLSTATE INSURANCE COMPANY

*v.*

DANIEL P. CHATIGNY *& a.*

Argued November 1, 1960.

Decided November 30, 1960.

*Devine, Millimet & McDonough* and *Matthias J. Reynolds* (*Mr. Reynolds* orally), for the plaintiff.

*John W. King* (by brief and orally), for Stanley and Dorothy Marszalek.

*Robert Shaw* (by brief and orally), for Daniel P. Chatigny and John Willett, Jr.

LAMPRON, J.  Daniel Chatigny testified at the hearing that he was discharged from the Navy on July 9, 1957.  Willett, a friend of his brother, had lost his license to drive.  He was an automobile salesman and "I realized he needed help, so I told him I'd help him out, drive him around when he took someone out . . . most of the time I drove the garage car, whatever car the customer wanted to buy."

He testified further that starting July 10 he drove Willett around until the day of the accident, July 27, while at the same time looking for a job.  He did not have regular hours nor did he receive regular payment.  Willett would give him "what he felt like."  Daniel did not take the car to his home overnight and did

not have the general use of it for himself. He would go to Willett's house in the morning which was "a short ways" from his home and drive him to work. He used Willett's car for his own use about once in the two weeks he drove for him and he had to ask his permission to use it.

On the day of the accident Daniel had driven Willett and his wife to a gathering which he attended with a girl friend. "After we finished eating I went to John Willett and asked him would he give me his permission to use his car to bring Muriel back to Elliot Hospital." He received permission and was given the key to the car by Willett. The accident happened on the return trip from Manchester. Willett's testimony was generally similar.

This evidence shows an infrequent and casual use of the Willett car by special permission on particular occasions and would amply support the Trial Court's finding that the car operated by Daniel at the time of the accident "was not a motor vehicle furnished for the regular use of the said Daniel P. Chatigny." *Giokaris* v. *Kincaid*, (Mo.) 331 S. W. 2d 633, 641. *Cf. Davy* v. *Merchants &c. Cas. Co.*, 97 N. H. 236; *Aler* v. *Travelers Indemnity Co.*, 92 F. Supp. 620 (D. Md. 1950); *Farm Bureau Mutual Automobile Ins. Co.* v. *Marr*, 128 F. Supp. 67 (D. N. J. 1955).

However plaintiff introduced in evidence a written statement of Chatigny taken by one of its adjusters a few days after the accident. Chatigny admitted signing this statement which was in the adjuster's handwriting except for the word "yes" written twice by Chatigny in answer to questions as to whether he had read the statement and whether it was true and correct. It contained the following: "I had free personal use of the car, a 1957 Ford, and he supplied all of the gas and oil. The arrangement was that I would chauffeur for him during the day. I could have the car for my own use at night and on Sundays . . . When Mr. Willett was through working for the day I would drive him home to his house . . . I used the car every night from the time I started work for him . . . On the night of July 27th when I took my girl friend . . . from Exeter to the Elliot Hospital in Manchester I did not have to ask Mr. Willett for his permission to make this trip. When he was through working I could use his car as I saw fit."

A signed statement taken from Willett by the same adjuster in the latter's handwriting was also introduced in evidence. It was stated therein that during the three weeks that Chatigny was employed by him as a chauffeur he had an agreement with Chatigny

that "when I was done working he could take my car for his own personal use."

Plaintiff maintains that these statements clearly indicate a use which was excluded under their policies and that by accepting as credible the testimony of Chatigny and Willett "the Trial Court abused its discretion and failed to act in a reasonable fashion. The evidence and weight of the evidence, was so overwhelmingly and conclusively against accepting such testimony over the version contained in their written statements, that the findings and rulings made should be overruled." *Condiles* v. *Waumbec Mills,* 95 N. H. 127.

Chatigny's statement was taken four days after the accident while he was in the hospital with a split jaw, an injured arm and a cut on his chin which required seventeen stitches. Willett testified that he did not want to sign his statement until he saw an attorney and signed it on his advice because the attorney "was told that that statement was for a file of the Allstate Insurance Company and that that's all it was for and . . . this was to be for my own use and there was nothing in it there that was going to hurt me, and he told me that I could sign it under those conditions."

"Although the test in such situations as this has been put in innumerable ways and often at great length it all boils down to this — could reasonable persons have believed the" witnesses. *Wilson* v. *Bank,* 95 N. H. 113, 116. The Trial Court had the opportunity to observe Chatigny and Willett and the other witnesses on the stand, to assay their testimony and determine its sincerity. We cannot say that the Trial Court was wrong as a matter of law in concluding on all the evidence that the Willett car was "not regularly furnished for use" of Chatigny under the terms of plaintiff's policies. *Lampesis* v. *Comolli,* 101 N. H. 279, 283; *Giokaris* v. *Kincaid, supra.*

Plaintiff's adjuster, one Flaherty, testified that Willett told him he would have to consult his attorney before giving a statement. Consequently he accompanied Willett to the courthouse and obtained permission from his attorney to take the statement. "After taking the statement Mr. Willett read it and then I took the statement to Mr. Shaw . . . he read the statement and told Mr. Willett it would be all right to sign it."

The following colloquy took place on cross-examination. "Q. Did you see Mr. Shaw read that statement? A. Yes, sir, I did.

Q. You sure of that? A. I am positive. Q. Isn't it a fact that he was too busy there to be bothered with it? A. He didn't say that to me." There were other questions pertaining to the taking of the statement.

Plaintiff then offered in evidence a memorandum under date of August 1, 1957 from the witness to his company "to corroborate by a contemporaneous entry in the course of business made by Mr. Flaherty in a report to his employers that the statement was taken in the manner he has testified to from Mr. Willett at the courthouse; that the statement was read by Mr. Shaw before it was signed by Mr. Willett." Upon objection by defendants the memorandum was not received in evidence.

Plaintiff points out in his brief that the Trial Court could have received this evidence to refute the inference that Flaherty's statements at the trial were a fabrication. See *Twardosky* v. *Company*, 95 N. H. 279, 284. However the admissibility of such evidence rests within the discretion of the Trial Court. See *Marchand* v. *Company*, 95 N. H. 422; *State* v. *Skillings*, 99 N. H. 427, 429. We find no abuse of discretion in its exclusion.

*Exceptions overruled.*

All concurred.